

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 27, 2020

**BY ECF**
The Honorable Paul A. Crotty
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007

      Re:    **United States v. Chandler, 19 Cr. 867 (PAC)**

Dear Judge Crotty:

      The Government submits this letter in opposition to the defendant's March 23, 2020 application for release from pretrial detention. (See Doc. No. 16.)

      The current bail application is the defendant's fourth. The Court denied the defendant's three prior applications because it found that the defendant's release would endanger others and the community at large.[1] The facts supporting that finding have not changed. As before, the defendant is charged with unlawfully possessing a firearm because, in the aftermath of a gang-related shooting, he held a revolver that contained seven spent shell casings. As before, the defendant is a convicted felon who pleaded guilty in 2009 to first-degree manslaughter because he shot and killed another person.

      The defendant identifies no new facts bearing on his dangerousness. Instead, he argues that, in light of the COVID-19 health crisis, the Metropolitan Correctional Center (the "MCC") has become uninhabitable for inmates and that measures put in place to limit the spread of COVID-19 have violated his Sixth Amendment right to counsel.

      The Court should deny the bail application. First, the defendant remains dangerous, and detention remains appropriate on that basis. The conditions of confinement are not a statutory basis for release on bail. Second, the Bureau of Prisons ("BOP") is taking substantial steps to limit the spread of COVID-19. Third, the defendant—a 33-year-old with no chronic health problems—has not shown that he is uniquely at-risk for developing serious symptoms from COVID-19 in the event he becomes infected. Fourth, the defendant is being afforded reasonable access to counsel under the circumstances and any temporary restriction on in-person counsel visits has not impaired

---

[1]  As set forth below, the first bail application was denied by Magistrate Judge Sarah Netburn, and the second and third applications were denied by Your Honor.

his defense.  Finally, there is no "compelling reason" to temporarily release the defendant pursuant to 18 U.S.C. § 3142(i).

## I. Background

### A. The Charged Conduct

Beginning October 3 and into the early morning of October 4, 2019, a party was held near the intersection of Beach Avenue and McGraw Avenue in the Bronx.  Social media posts reveal that the occasion for the party was to celebrate the Grape Street Crips, a gang originating in California with members in New York City.  Social media posts further suggest that the defendant was a member of the Grape Street Crips: earlier in 2019, the defendant had posed in photographs with other Grape Street Crips members who were displaying gang signs and wearing gang attire.

Shortly before 2:00 a.m. on October 4, the police were alerted, through 911 calls and shot spotter activations, that numerous gunshots were being fired near the Crips party.  Officers responded to the scene and were flagged down by the defendant, who was trying to get medical assistance for his friend (the "Friend"), who had been shot multiple times.  As officers were attending to the Friend, the defendant stood on the sidewalk.  A police officer saw the defendant drop an object onto the sidewalk and kick at the object twice.  The second kick connected with the object, which landed in the street.  Immediately, police officers apprehended the defendant and secured the object.

The object that the defendant tried to kick away was a Taurus .357 magnum caliber revolver (the "Gun"), which contained seven spent shell casings.  Subsequent tests determined that the Gun was operable.  Apart from the shell casings found inside the Gun, police officers recovered numerous other shell casings on the street, including casings for at least two other calibers of ammunition.  Officers also found bullet holes in cars at the scene.

At the time of the incident, the defendant was a convicted felon.  In 2006, the defendant was charged with murder and other offenses in connection with an incident in which he shot and killed another person.  The defendant ultimately pleaded guilty to manslaughter in the first degree, in violation of New York Penal Law 125.20(1), and was sentenced to eight years' imprisonment in 2009.

### B. Prior Bail Applications

The defendant was arrested and presented on November 20, 2019 before Magistrate Judge Sarah Netburn.  In light of the nature of the offense and the defendant's criminal history, the Government sought detention pursuant to 18 U.S.C. § 3142(f) based on dangerousness and risk of flight.  The defendant sought bail.  Judge Netburn ordered the defendant detained on dangerousness grounds, noting "it's hard to get [past] that, to have somebody who has been previously convicted of a violent offense like manslaughter and then appear before me having possessed a weapon, and in this case a weapon that has spent shells."  (Nov. 20, 2019 Tr. 15:7–15.)

On December 16, 2019, the defendant sought bail before this Court, raising many of the same arguments already heard by Judge Netburn. At the conclusion of the argument, this Court ordered the defendant detained, noting "I think Magistrate Judge Netburn got it exactly right. I don't think there are any conditions that are sufficient to eliminate or reduce the risk to the community so I'm going to join in the magistrate judge's determination and deny bail to Mr. Chandler." (Dec. 16, 2019 Tr. 22:18–22.)

On March 4, 2020, the defendant made a third bail application, arguing that he had been deprived of his Sixth Amendment right to counsel because the MCC had been locked down for approximately one week, during which time defense counsel was unable to meet with the defendant.[2] The Court heard oral argument on March 9, by which time the defense counsel had been able to visit the defendant under a modified visiting procedure. At the oral argument, the Government advised the Court that the MCC would soon be resuming normal visiting operation and that the Government would not object to an adjournment of the trial date (then set for April 27) to make up for any time defense counsel may have lost. The Court held: "I don't see any reason to change the decision that's been made on two prior occasions, once by Judge Netburn, once by myself, about not admitting Mr. Chandler to bail." (Mar. 9, 2020 Tr. 11:14–17.) The Court adjourned the trial date to May 11, 2020 to give the defense additional time to prepare.

On March 23, 2020, the defendant filed the instant bail application based on the COVID-19 health crisis. (Doc. No. 16.)

## II. Applicable Law

Under the Bail Reform Act, a court must order a defendant detained upon finding that there is "no condition or combination of conditions [that] will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

In making a detention determination, the court is required to consider: (1) the "nature and circumstances of the offense charged, including whether the offense is a crime of violence . . ."; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person, including . . . criminal history"; (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." Id. § 3142(g).

## III. Discussion

### A. The Defendant Remains a Danger to the Community

Since March 9, when the Court last found that the defendant should be detained on dangerousness grounds, no new facts have emerged relating to the defendant's dangerousness. Indeed, the defendant's application contains almost no discussion about the defendant or the facts

---

[2] As the Court is aware, the MCC was locked down because the BOP had reason to believe that a loaded gun had been smuggled inside. In fact, a loaded gun was recovered from a housing unit in the MCC.

of the case.³ The same considerations that led this Court and Judge Netburn to find that the defendant's release poses an unacceptable—and immitigable—risk to community safety remain true today: the defendant is charged with unlawfully possessing a loaded handgun following a prior conviction for first-degree manslaughter.⁴ Unlawful possession of a firearm in violation of 18 U.S.C. § 922(g) is a "crime of violence." United States v. Dillard, 214 F.3d 88, 91 (2d Cir. 2000).

Rather than address the inquiry under the Bail Reform Act or identify new facts bearing on that inquiry, the defendant focuses entirely on developments in the severity of the public health crisis created by COVID-19. While the Government addresses the defendant's contentions below, no generalized facts relating to the COVID-19 crisis can have any relevance to whether the defendant poses a danger to the community (or a risk of flight). The conditions of confinement are not a statutory basis for release under the Bail Reform Act. See 18 U.S.C. § 3142(e)–(g); United States v. Valerio, 9 F. Supp. 3d 283, 293–94 (E.D.N.Y. 2014) ("The Bail Reform Act address conditions of *release,* not conditions of *detention.*").

---

³ The defense submission alludes to two disclosures that the Government made pursuant to Brady v. Maryland, 373 U.S. 83 (1963). Those disclosures consisted of the following:

1. On or about February 10, 2020, [the Friend] stated to law enforcement, in sum and substance, the following: (a) [the Friend] and the defendant did not have or bring any guns to the October 4, 2019 shooting; (b) [the Friend] and the defendant did not belong and never belonged to the Grape Street Crips or any other gang; (c) the reason [the Friend] and the defendant chose to go to the party at which the shooting occurred was not because the party was gang-related; and (d) the defendant had nothing to do with the shooting.

2. The Laboratory Report of a blue hooded sweatshirt recovered from the defendant, produced as USAO_000413 - 000416, states in the "Results of Examination": "No residues or physical effects consistent with the discharge of a firearm."

Neither fact is new. The Government made both disclosures on February 24, 2020, and defense counsel alluded to these disclosures at the March 9 argument. (Mar. 9, 2020 Tr. 3:9–12.) In any event, neither fact undermines the Government's case. With respect to the Friend's statements, the Friend has also told the Government, in sum and substance, that he had no memory of anything that happened shortly after he was shot up until when he woke up at the hospital. With respect to the gun residue, the Government expects the trial evidence to show that the condition of the sweatshirt is consistent with the possibility that the defendant fired the Gun or that he picked up the Gun after it had been fired.

⁴ For this reason, United States v. Stephens, 15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020), is distinguishable. In Stephens, "the strength of the primary evidence relied upon by the Government to demonstrate the danger the Defendant poses to the community has been undermined by new information not available to either party at the time of" the prior bail determination. Id. at *1. Here, no facts have changed since the March 9 bail argument.

### B. The BOP is Taking Appropriate Steps to Mitigate the Spread of COVID-19 at the MCC

The Government does not dispute that the COVID-19 health crisis is serious. The challenges posed by that crisis are not unique to the MCC, however, and the BOP is taking appropriate steps to mitigate and prevent the spread of COVID-19 at its facilities, including the MCC.

Since at least October 2012, the BOP has had a Pandemic Influenza Plan in place. See BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp.2. Beginning approximately two months ago, in January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. See Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp.

As part of its Phase One response to COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." Id. In addition, BOP assembled "an agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the WHO, the CDC, the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President." Id. On March 13, 2020, in coordination with the Department of Justice and the White House, the BOP implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." Id.

The BOP has implemented measures designed "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." Id. For example, the BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates' movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." Id.

The BOP also implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. Id. As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." Id.

The specific measures implemented at the MCC are described in a letter that the BOP submitted to Chief Judge Colleen McMahon on March 18, 2020, annexed hereto as Exhibit A. Those measures include:

- <u>Screening of staff</u>: All MCC staff are screened every day upon arrival by medical staff wearing personal protective equipment. Any staff person with a fever or responding in the affirmative to any question on a screening form is denied entrance.

- <u>Suspension of new inmates</u>: As of approximately March 24, 2020, the MCC is no longer accepting new inmates.[5]

- <u>Medical staff availability</u>: All medical staff are now available around the clock.

- <u>Isolation of at-risk population</u>: Inmates over 55 years' old or with certain conditions are isolated within one unit at the MCC, with some exceptions relating to security concerns.

- <u>Suspension of visits</u>: Social and legal visits have been suspended. To compensate, additional telephone minutes for social calls and legal calls have been provided to all inmates.

- <u>Social distancing</u>: Inmates are permitted to self-seclude in their cells to avoid contact with others.

- <u>Cleaning and hygiene</u>: Soap was delivered to all inmates on March 13 and again the week of March 16. Additional soap is available for purchase and soap is provided at no cost to any inmate who cannot afford to purchase it. The MCC continues to be stocked with cleaning supplies and common areas are cleaned on a regular basis.

Doubtless, notwithstanding the measures above, the MCC will not be immune to a virus that is projected to infect 40 to 80 percent of the overall population of the United States.[6] To date, the Government is aware of a single confirmed case of COVID-19 at the MCC, and it is possible that there will be additional cases in the coming weeks and months. However, given the measures that the BOP has implemented and the inherently isolated nature of the prison environment, there is no reason to believe that the defendant is at materially greater risk from COVID-19 at the MCC than he would be if released.

---

[5] As of the March 18 BOP letter to Judge McMahon, the MCC was still accepting inmates and was screening them pursuant to the BOP protocol. Following a confirmed case of COVID-19 at the MCC on or about March 23, 2020, the MCC stopped admitting new inmates.

[6] <u>See</u> Transcript of March 22, 2020 Remarks of Governor Andrew Cuomo, https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-cuomo-calls-covid-19-pandemic-challenge-generation.

### C. **The Defendant Is Not Uniquely At-Risk for Contracting COVID-19 or Developing Serious Symptoms If Infected**

The defendant's application identifies no specific facts suggesting that the defendant, in particular, is at risk of contracting COVID-19 or developing serious symptoms if he does. Indeed, the thrust of the application seems to be that, given COVID-19, all prisons are unsuitable for habitation and all inmates on pretrial detention must accordingly be released. (Doc. No. 16 at 2–5 (arguing that "Prisons are petri dishes for contagious respiratory illnesses" and citing other BOP facilities, New York City jails, prisons in other parts of the United States, and foreign prisons).) The Bail Reform Act does not authorize—much less require—so drastic a remedy.

Even if, for the sake of argument, conditions of confinement were a basis for release under the Bail Reform Act,[7] the Court would be required to consider "the history and characteristics *of the person*" including "*the person's* . . . physical and mental condition." 18 U.S.C. § 3142(g)(3) (emphases added). In order words, the Court would be required to consider the individualized circumstances of the defendant, rather than generalized facts about the COVID-19 crisis.

The defendant is a 33-year-old man. The defendant's submission does not suggest that the defendant has any immune system disorder or chronic illness that would put him at heightened risk for COVID-19.[8] Given available public health guidance, individuals in the defendant's demographic are at a low-risk of developing serious symptoms from COVID-19. To be clear, the Government does not minimize the risk that COVID-19 poses to everyone and understands that even people in the low-risk category can get sick and can be hospitalized. However, the mere possibility that the defendant may contract COVID-19 is not a reason to release him on bail.

Even if the defendant contracted COVID-19 at some point, that alone would not be a reason to release him on bail. According to public health authorities, the vast majority of individuals who contract COVID-19 are expected to recover with mild or no symptoms. Health authorities have directed that, absent severe symptoms that require hospitalization, a person infected with COVID-19 need not and should not seek professional medical treatment. See New York City Department of Health and Mental Hygiene, Coronavirus Disease 2019 (COVID-19) (last visited Mar. 26, 2020), https://www1.nyc.gov/site/doh/covid/covid-19-main.page ("If you think you have COVID-

---

[7] As discussed already, the Bail Reform Act does not permit such an inquiry. The factors set forth in § 3142(g) bear on whether "there are conditions of release that will reasonable assure the appearance of the person as required and the safety of any other person and the community"—that is, risk of flight and dangerousness. 18 U.S.C. § 3142(g).

[8] The defense contends—without elaboration—that the defendant has encountered difficulty getting treatment for an unspecified medical condition. (Doc. No. 16 at 5 n.30.) Based on statements that the defense has made at prior court appearances, the defense may be referring to shoulder pain. (See Dec. 16, 2019 Tr. 10:6–9; Mar. 9, 2020 Tr. 6:1–21.) Shoulder pain is not a medical condition that puts a person at higher risk for COVID-19. See Centers for Disease Control, People Who are at Higher Risk, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html.

19 and your illness is mild, you do not need to see your health care provider and you will not be tested. Getting tested will not change what your provider will tell you to do to get better. They will tell you to stay home so you do not get others sick."); New York City Department of Health and Mental Hygiene, 2020 Advisory #8: COVID-19 Update for New York City (Mar. 20, 2020), https://www1.nyc.gov/assets/doh/downloads/pdf/han/advisory/2020/covid-19-03202020.pdf ("There is no reason to test asymptomatic persons or mild-to-moderately ill persons who are not hospitalized."). If the defendant contracts COVID-19 and, like most individuals, has mild or no symptoms, the fact that he has the virus does not justify his release on bail.

In sum, nothing about the defendant's individual health suggests that he is uniquely likely to contract COVID-19 or to develop severe symptoms if he does become infected. Even if there comes a time when the defendant requires medical care that cannot be provided at the MCC, the remedy would be to provide him the medical care he needs—not to release him on bail.

### D. The Defendant Is Being Afforded Reasonable Access to Counsel Under the Circumstances and His Defense Has Not Been Impaired

As described above, the BOP has restricted in-person visits at the MCC to minimize the risk that visitors, including defense counsel, will transmit COVID-19 to inmates. The defendant remains free to speak with counsel by phone, and the number of minutes allotted for legal calls has been increased. Furthermore, inmates continue to have access to the law library and to receive legal discovery.[9] In short, the defendant continues to have the opportunity to communicate with his counsel about the case, consistent with the Sixth Amendment.

Trial in this matter is currently scheduled for May 11, 2020. However, the Court's deputy has advised the parties by email that "It is safe to say that the May 11 trial date and briefing schedule is continued." Given the current trajectory of COVID-19, it appears unlikely that a trial will proceed on May 11 or in the near term. Accordingly, any current limitation on defense counsel's ability to confer with the defendant will not impair the defense's ability to prepare for trial.

When it becomes possible to set a trial date and pretrial schedule, the Government will not object to any reasonable period of time the defense needs to make up for time lost due to measures designed to prevent the spread of COVID-19 at the MCC.

### E. Temporary Release Pursuant to 18 U.S.C. § 3142(i) Is Not Warranted

With respect to defendants already ordered detained, the Bail Reform Act provides that a judicial officer "may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial

---

[9]   The Government's most recent Rule 16 production was made to the defense on March 9, 2020. On March 12, defense counsel advised the Government that it had mailed a copy of the materials to the MCC, but that the defendant had not yet received the material. At the defense's request, the Government will mail a full set of all discovery to the defendant at the MCC; due to COVID-19, the MCC is no longer accepting direct delivery of discovery from the Government.

officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).

In the alternative to release on bail, the defendant seeks temporary release under this provision, arguing that release is necessary to protect him from COVID-19 and to allow him to assist in his own defense.

Certain extreme medical emergencies may present "compelling reason[s]" that would warrant release. For example, in United States v. Scarpa, 815 F. Supp. 88 (E.D.N.Y. 1993), the court ordered the temporary release of a defendant who was terminally ill with AIDS, was expected to die before trial, and whose condition could not be managed by prison medical facilities. Even under those circumstances, the defendant was not simply permitted to go home: the court required the defendant to be confined to a hospital under 24-hour guard of the United States Marshals, to be reimbursed by the defendant's family. Id.

Here, as discussed, the defendant has identified no specific facts suggesting that COVID-19 poses an immediate and severe risk to him. Instead, he has relied solely on generalized facts that apply to all inmates. That does not satisfy the showing required under § 3142(i). United States v. Acosta, 19 Cr. 848 (NRB) (S.D.N.Y. Mar. 25, 2020), Doc. No. 14 (denying bail application for inmate detained in MCC that "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus"). Accepting generic COVID-19 arguments, such as the one advanced here, would "logically result in the wholesale release of inmates." Id. Indeed, since the inception of COVID-19, judges in this District have consistently rejected applications for release from individuals with more specific health concerns than the defendant. See United States v. Bradley, 19 Cr. 632 (GBD) (S.D.N.Y. Mar. 25, 2020), Doc. No. 25 (denying bail application for inmate detained in MCC on controlled substances and firearm charges who had recently experienced a stroke and had high blood pressure); United States v. Rivera, 20 Cr. 6 (JSR) (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC on controlled substance charge who had a childhood history of asthma); United States v. White, 19 Cr. 536 (PKC) (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained at Valhalla on controlled substance and Hobbs Act charges with history of whooping cough); United States v. Alvarez, 19 Cr. 622 (DLC) (S.D.N.Y. Mar. 24, 2020), Doc. No. 17 (denying bail application for inmate detained in MCC on controlled substances charges who had been diagnosed with Hepatitis B).[10]

Temporary release is also not necessary to allow the defendant to prepare in his defense. As discussed, the trial is very unlikely to proceed on May 11, and the Government will not oppose

---

[10] By way of contrast, in United States v. Perez, the court ordered the temporary release of a defendant with "serious *progressive lung disease* and other significant health issues" that put him "at a substantially heightened risk of dangerous complications should be contract COVID-19 *as compared to most other individuals*." 19 Cr. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (emphases added).

an appropriate adjournment of the trial date (and any pretrial deadlines) to allow defense counsel sufficient time to prepare and confer with the defendant.

### IV. Conclusion

For the reasons set forth above, the defendant's fourth application for release under the Bail Reform Act should be denied.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

by:    /s/ Jun Xiang
Jun Xiang
Michael D. Longyear
Assistant United States Attorneys
(212) 637-2289 / -2223

**CC**
Defense Counsel (By ECF)

# **EXHIBIT A**



**U.S. Department of Justice**

Federal Bureau of Prisons

*Metropolitan Correctional Center*

---

*150 Park Row*
*New York, NY 10007*

March 18, 2020

Hon. Colleen McMahon
Chief Judge Southern District of New York
Daniel Patrick Moynihan
500 Pearl St.
New York, NY 10007

**RE:   MCC New York and MDC Brooklyn's COVID-19 plans**

Dear Chief Judge McMahon:

The Court has asked the MDC and MCC respond to concerns about our institutional responses to the COVID-19 pandemic. Specifically, the Court asked about provision of medical care, procedures for social distancing and measures being taken to screen and isolate new arrivals, staff and the at risk population.

With respect to staff screening procedures, medical staff wearing appropriate personal protective equipment are responsible for screening each and every staff member and contractor upon arrival to the institution, prior to security screening. Each individual's temperature will be taken and recorded using an infrared thermometer. The staff member is also asked a series of questions, and the responses are recorded on a screening form (attached). If the staff member has a fever, or answered "yes" to any question on the form, the medical professional can deny the staff member entrance to the institution pending clearance from Central Office for the staff member to return to work.

New arrivals to the institution are screened in the same fashion by health services staff. The screening form utilized for inmates is attached to this email as well. Any inmate transported to Court, per administrative orders from the Eastern and Southern District Courts, has his or her temperature taken. If his or her body temperature is 100.4 degrees or higher, he or she will not be sent to Court, and the United States Marshals Service will notify the respective Court.

Finally, because health services staff are required to screen staff members entering the institution, medical staffing levels and availability within the institution has increased to around the clock. At this time, inmates are not on lockdown status at either institution. They may walk around and utilize the common area of their housing units as normal operations. However, if they choose to do so, they may remain in their cells to self-seclude.

Both institutions are providing three meals a day; two of these are hot meals. The breakfast meal is a cold meal. The Bureau of Prisons has a National Menu and both institutions follow the National High Rise menu. A copy of this menu for each institution is attached for the week of March 16.

At MCC New York, on Friday, March 13, 2020, bars of soap were delivered to each of the units. This week, another delivery has been made. Commissary will be up and running next week so that inmates who have the ability to purchase different soap can. In the meantime, staff will be passing out soap and other hygiene items to the inmate population. Any inmate who does not have the money to purchase soap will be afforded the institution soap at no cost. Cleaning supplies are available on each unit and staff have been instructed about who to contact should additional supplies be needed. Inmate orderlies are cleaning the common areas and inmates have been instructed to continue to wipe down their cells.

MCC New York has moved the majority of its "at risk" population—inmates over 55 year old, and/or diagnosed with certain conditions—to one unit in the building. Some inmates were not moved due to security concerns (separations). Medical staff are aware of all the "at-risk" inmates and will continue to monitor them along with the rest of population.

Since the inmate population is not locked down, showers are available as they would be at any other time. MCC unit team staff and officers are available to the inmate population to address issues about food, shoes and medical care. Unit team staff have been on the units providing legal calls for the attorneys and inmates that have requested them. Should an inmate have an issue related to property, medical and/or food they can address this with the unit staff.
At MDC Brooklyn, hygiene supplies are provided to the Unit Team for all units on a bi-weekly basis. Each inmate had been provided one roll of toilet tissue per week, but as of this week, are being provided two rolls per week. Hygiene items, including soap, are provided to inmates upon admission. Thereafter, they may request subsequent supplies as needed from their respective unit team. They may also purchase additional items, including antibacterial soap, from the commissary.

At MDC Brooklyn, cleaning supplies are issued once a week. They are available on each housing unit, and staff have been instructed regarding who to contact should additional supplies be necessary. Inmate orderlies are cleaning the common areas of the institution, and every inmate has been reminded and instructed to continue to wipe down and sanitize their cells. Inmates have also been provided instruction via town halls regarding hygiene, and the same guidance is available on TRULINCS.

MDC Brooklyn has not isolated its "at risk" population at this time because the number of inmates who fall into this category is too large to contain and isolate on one or even two units. However, all inmates in this category have been identified by health services, and the list is generated and updated daily. Health services will continue to monitor their needs, as well as those of the rest of the population.

Since the inmate population at MDC Brooklyn is not locked down either, showers are available on a daily basis. Unit team staff are available on a daily basis for inmates to raise issues concerning food, shoes, and even medical care. However, medical issues should be raised with providers through the TRULINCS system. Health related emergencies should be immediately reported to any staff member so they can be addressed.

Legal calls are being more liberally provided by unit team staff to maintain communication between inmates and their attorneys. Social phone calls are also provided on a more liberal basis bureau-wide—inmates may now utilize 500 minutes a month, rather than 300.

Without specific information and only generalized statements about conditions at the institutions, it is difficult to further address any allegations raised. Should the Court have other questions, or

individualized inquiries, please do not hesitate to contact Ms. McFarland or Ms. Pratesi. Finally, as the nationwide, regional, and local guidance is subject to evolve on a frequent basis, so further updates can be provided when substantial changes to this information occur.

Sincerely,

M. Licon-Vitale
Warden
MCC New York

D. Edge
Warden
MDC Brooklyn